UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

AARON L. JONES,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )      No. 4:10 CV 3 DDN
                                   )
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
            Defendant.             )

**MEMORANDUM OPINION**

This action is before the court for judicial review of the final
decision of the defendant Commissioner of Social Security denying the
application of plaintiff Aaron L. Jones for disability insurance benefits
under Title II of the Social Security Act, 42 U.S.C. § 401, <u>et seq.</u>, and
supplemental security income under Title XVI of the Act, 42 U.S.C. §
1381, <u>et seq.</u>  The parties have consented to the exercise of plenary
authority by the undersigned United States Magistrate Judge pursuant to
28 U.S.C. § 636(c).

For the reasons set forth below, the decision of the administrative
law judge (ALJ) is reversed and remanded for further proceedings.

**I.  BACKGROUND**

Plaintiff Aaron L. Jones was born on March 27, 1963. (Tr. 9.)  He
is 5 feet 10 inches tall, and weighed 375 pounds at the time his  hearing
before the administrative law judge (ALJ) (<u>Id.</u>)  On June 11, 2007,
plaintiff filed applications with the Social Security Administration for
disability insurance benefits and for supplemental security income,
alleging he became disabled on March 31, 2006, on account of chronic pain
in his back and numbness in his legs.  (<u>Id.</u>)  He argued that his
disability resulted from a machinery accident and poor blood circulation
in his legs. (Tr. 23.)  In addition, plaintiff claimed that he has high
blood pressure and a mental impairment, such as depression. (Tr. 25,
260.)

After the initial review of his claims resulted in their denial, on
August 14, 2008, an ALJ held a hearing, and on September 18, 2008, the
ALJ ruled plaintiff was not disabled under the Social Security Act.  On
November 21, 2009, the Appeals Council denied his request for review of
the ALJ's decision.  (Tr. 1-3.)  Thus, the decision of the ALJ stands as
the final decision of the Commissioner for judicial review.

## II.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision
is to determine whether the Commissioner's findings apply the relevant
legal standards and is supported by substantial evidence in the record
as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).
"Substantial evidence is less than a preponderance, but is enough that
a reasonable mind would find it adequate to support the Commissioner's
conclusion."  Id.  In determining whether the evidence is substantial,
the court considers evidence that both supports and detracts from the
Commissioner's decision.  Id.  As long as substantial evidence supports
the decision, the court may not reverse it merely because substantial
evidence exists in the record that would support a contrary outcome or
because the court would have decided the case differently.  See Krogmeier
v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is
unable to perform any substantial gainful activity due to a medically
determinable physical or mental impairment that would either result in
death or which has lasted or could be expected to last for at least
twelve continuous months.   42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A),
1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.   A five-step regulatory
framework is used to determine whether an individual qualifies for
disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)[1]; see also Bowen

---

[1]Plaintiff applied for disability benefits under both Title II and
Title XVI of the Social Security Act.   Separate regulations are
promulgated under each of these statutory titles, in Parts 404 and 416
of Title 20 of the Code of Federal Regulations.   The language of the
relevant regulations in one Part is largely identical to those in the
other Part.   Therefore, the court will cite the language of the
(continued...)

v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to decide what the claimant's residual functional capacity is and consider whether with it the claimant can perform his past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show that the claimant retains the RFC to perform other work. Id.

### III.  ADMINISTRATIVE RECORD

Plaintiff's work history indicates that during the 1980's his back was injured while working on machinery; he attributes a current disk problem to this incident. (Tr. 23.) He worked for various employers from 1990 to 2003 as a general laborer. In 2003 he began working for the Paraquad, Inc., Empowerment Center as a client monitor. (Tr. 121.)

On May 16, 2005, plaintiff went to the St. Louis University Hospital emergency room for pain and in his right leg and weakness in his right knee. (Tr. 169, 173.) He also complained of low back pain. (Tr. 172.) There he was given a physical exam. The musculoskeletal portion of the exam form indicated that plaintiff was able to move all of his extremities. (Tr. 173.) He was given information sheets for caring for low back pain and he was prescribed Robaxin and Motrin.[2] (Tr. 175.)

---

[1](...continued)
applicable regulations only as it appears in Part 404.

[2]Robaxin is used to relax muscles, thereby decreasing muscle pain and spasms associated with strains, sprains, and other muscle injuries. http://www.webmd.com/drugs (last visited May 11, 2011).

On July 13, 2005, plaintiff visited the Family Care Health Center. His lower legs were clearly asymmetrical, with 2+ edema below knee in his left leg. (Tr. 176.) He was advised to visit St. Alexius Hospital for deep vein thrombosis evaluation. (Id.)

On July 13, 2005, plaintiff went to St. Alexius Hospital emergency room with complaints of swelling of his legs, which, according to him, was aggravated by weight-bearing, but the cause was unknown. (Tr. 178.) He was alert and in no apparent, acute distress. He was found to have soft mild tissue tenderness in his right leg. The range of motion in all his extremities was intact. (Id.) His left calf measured 45.5 centimeters in diameter and his right calf measured 46 centimeters. (Id.) He was diagnosed with muscle strain in his leg. (Id.) He was prescribed Ultracet for pain and Ibuprofen.[3] (Id.) Also, according to ultrasonography taken on the same day, plaintiff had no deep venous thrombosis in his left leg. (Tr. 180.)

On February 26, 2007, at the Grace Hill Neighborhood Health Center (Grace Hill) he was diagnosed with lower extremity edema, greater on the left than on the right, high blood pressure, and obesity. (Tr. 233.) Between then and May 2008, plaintiff was treated four times at Grace Hill Neighborhood Health Center (Grace Hill) for leg pain, edema, and obesity. (Tr. 230-47.)

On June 11, 2007, in a face-to-face interview when he filed his disability claims, plaintiff provided information to a disability field office and a Social Security Administration disability report form was filled out. The interviewer reported that plaintiff complained of numbness in his legs and hands and complained of back pain. He stated he could not stand for more than an hour and a half. He stated that he cannot grab things like he used to. (Tr. 120.) Plaintiff described his past work as a general laborer for various employers. He stated he "bagged fiber, put in a heat machine, molded fiber plastic material. I cleaned, maintained machines, did all kinds of work all day long." In this job, he was required to be able to walk; stand; climb; stoop;

---

[3]Ultracet is used to treat moderate to moderately severe pain. http://www.webmd.com/drugs (last visited May 11, 2011).

handle, grab or grasp big objects; and reach for 8 hours. He did not sit. He was required to kneel for 2 hours, crouch for 3 hours, and handle small objects for 3 hours. He further described this work as lifting a few pounds of fibre and carrying it 40 feet all day long. The heaviest weight he lifted was 30 pounds. He frequently lifted 10 pounds. (Tr. 121.) The form reported that he attended high school from 1978 to 1982, and that he was in a special class for people with reading problems. (Tr. 125.)

On August 6 and 7, 2007, plaintiff was evaluated and was diagnosed at Hopewell Center with post-traumatic stress disorder (PTSD). He was assigned a Global Assessment Functioning score of 48/45.[4] (Tr. 190, 259-66.) Plaintiff was reported to have depression and periods of agitation. (Id.) A mental status exam carried out by his clinician indicated that he had moderate eye contact, a moderately acceptable memory, diminished judgment, and moderate insight; and that he was mildly dysthymic. (Id.)

On August 27, 2007, at the request of the Missouri Department of Elementary and Secondary Education, plaintiff was given a physical examination by Elbert Cason, M.D., and a psychological consultative evaluation by Thomas Davant Johns, Ph.D. (Tr. 199-212.)

In the physical examination, plaintiff weighed 359 pounds, and his blood pressure was 148/90. (Tr. 200.) Dr. Cason's diagnoses were morbid obesity, which contributed to much of his other pathology; numbness in the legs and hands; swelling in the feet making it difficult for him to get around; low back pain; and hypertension which was well-regulated by medication. (Tr. 202.) Dr. Cason found tenderness in the paravertebral lumbar area and decreased motion. (Id.) He opined that much of the

---

[4]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptoms severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.

On the GAF scale, a score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed., American Psychiatric Association 2000).

decreased motion was due to his enormously overweight condition. (<u>Id.</u>)
All other physical signs and test results were normal or unremarkable.
(Tr. 199-202.)

The August 27, 2007, physical examination included evaluation of his
ranges of motion. The range of motion in plaintiff's knees was seen to
be limited by his obesity. Plaintiff's hands were normal. His grip
strength in both hands was 4 out of 5 and his arm strength was 4 out of
5 in both arms. (Tr. 204.) Plaintiff's ability to flex his ankles was
limited by edema. His ability to move his head was limited by his
obesity. He had tenderness in the left paravertebral portion of his
back. Plaintiff's legs had 4 out of 5 muscle strength. Plaintiff's
effort in participating in the examination was rated as good. (Tr. 205.)

Also on August 27, 2008, psychologist Dr. Thomas Johns diagnosed
plaintiff with adjustment disorder with chronic depressed mood, without
treatment at the time, and with a personality disorder with antisocial
features. (Tr. 211.) Plaintiff's alcohol and drug dependence was
reportedly in sustained, full remission. (<u>Id.</u>) Plaintiff was assigned
a GAF score of 70.[5] (<u>Id.</u>)

On September 13, 2007, x-rays were taken at St. Alexius Hospital.
They revealed that plaintiff had lumbosacral disc narrowing and a slight
curvature of the spine to the right. The rest of the disc spaces and
vertebral bodies were seen as well maintained. (Tr. 213, 228.)

Following the x-rays, plaintiff was seen at Grace Hill four times.
On September 26, 2007, he reported that his leg pain was 8/10 and that
he had stopped taking prescribed Ibuprofen. (Tr. 234-37.)

On October 1, 2007, a psychiatric review technique form was filled
out by Aine Kresheck. The report recapped a review of the record. The
report indicated that plaintiff had mental impairments (affective
disorder, personality disorder, and a substance abuse disorder) that were
not severe. (Tr. 215, 218, 220.) The form report indicated that

_____

[5]On the GAF scale, a score from 61 to 70 represents mild symptoms
(such as depressed mood and mild insomnia), or some difficulty in social,
occupational, or school functioning (such as occasional truancy), but the
individual generally functions well and has some meaningful interpersonal
relationships. <u>Diagnostic and Statistical Manual of Mental Disorders</u>,
32-34 (4th ed., American Psychiatric Association 2000).

plaintiff's mental condition had only a mild limitation on his daily living activities, his ability to maintain social functioning, and his ability to maintain his concentration, persistence, or pace. Plaintiff had no episodes of decompensation related to his mental condition. (Tr. 223.)

On October 2, 2007, a disability examiner (DE) for the Social Security Administration, filled out a Physical Functional Capacity Assessment form to determine and record whether the record showed that plaintiff was disabled on or after March 31, 2006. (Tr. 31-37.) From the record before him, he determined that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and push or pull without limitation (including the operation of hand or foot controls). (Tr. 33.) To support these assessments, the DE stated:

> Clmt is 44 y/o, with a hx of morbid obesity and dx of DDD with slight lumbar scoliosis. Clmt complains of the numbness in the LE, hands and low back pain, along with the inability to squat or bend. Clmt states he can walk 1/2 block, stand for 20 minutes, climb three steps. Upon exam clmt demonstrated lumbar tenderness with reduced ROM of lumbar, cervical spine and also ROM in the LE with edema. Gait is described as wide stance with a slight limp on the left leg. Assessment reflects the most the clmt can perform despite these impairments on a sustained basis.

(Tr. 33-34.) Further in his written assessment of plaintiff's condition, the DE stated that plaintiff can occasionally climb ramps, stairs, ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl. As a basis for these findings, the DE states, "See exertional + clmt complaints." (Tr. 35.) Further in his written assessment, the DE finds that plaintiff had no limitation in his ability to reach (including overhead), handle things in gross manipulation, finger things in fine manipulation, and feel things. No basis for these findings is expressly stated. (Id.) Further in his written form assessment, the DE stated that plaintiff had no visual limitation and no communicative limitation. (Tr. 35-36.) Further, the DE found that the record indicated that plaintiff had no limitation with respect to the following environmental conditions: extreme cold; extreme heat; wetness; humidity; noise; vibration; and fumes, odors, dusts, gases, poor ventilation. He found

that plaintiff was limited to avoiding "concentrated exposure" to hazards from machinery and heights due to his morbid obesity. (Tr. 36.)

In his assessment of plaintiff's symptoms, the DE stated his assessment from the record:

> Clmt is 44 y/o, 12 yrs education, CC Case, Allegations of numbness in hands and legs, back pain, AOD=03/31/2066
>
> Clmt alleges difficulty lifting, squatting, bending, standing, walking, kneeling, stairs. MER provides dx of morbid obesity and DDD. Longitudinal evidence does not support the full range and severity of limitations, but the clmt does suffer from impairments expected to cause ongoing limitations. Allegations considered largely credible.

(Tr. 37.)

Finally, the DE stated in effect that, when he filled out this form and made these assessments, he did not have the benefit of a statement from any treating or examining source regarding plaintiff's physical capacities. (Id.)[6]

On November 6, 2007, Mr. Ashfaq filed a Disability Report - Field Office Form from his interview with plaintiff regarding his claims. (Tr. 113-18.) He noted that plaintiff was heavily built. (Tr. 117.) He further noted that plaintiff had difficulty sitting. Plaintiff was heard to mutter something irrelevant under his breath. Other than that, Mr. Ashfaq did not observe any other difficulty. (Id.)

On November 7, 2007, plaintiff reported that he had stopped taking medication because it made him drowsy. (Tr. 238-40.)

On November 28, 2007, plaintiff returned to Grace Hill, where it was noted that he was not taking his medication regularly. (Tr. 241-43.)

Plaintiff was not seen at Grace Hill again until May 19, 2008. (Tr. 244-47.) At that time, straight leg raising was normal, and plaintiff rated his leg pain at 8/10. (Id.) Plaintiff's compliance with

---

[6]At this part of the form, the DE answered No to the question, "Is treating or examining source statement(s) regarding the claimant's physical capacities in file?" Further the form defined a No answer as "includes situations [in] which there was no source or when the source(s) did not provide a statement regarding the claimant's physical capacities." (Tr. 37.)

medication was poor. (Tr. 247.) His treating doctor noted that he also brought two unidentified medications with him. (Id.)

In a completed Disability Report - Adult form and a Work History Report, completed but not dated or signed, plaintiff reported that he worked at general labor between 1990 and 2003 and was a client monitor after 2003. (Tr. 127.) In general labor, his task was to bag fiber, put it into a heat machine, and mold fiber plastic material. (Tr. 129.) He also cleaned and maintained machines. (Id.) This work required him to walk, stand, climb, stoop, reach, handle, and grab or grasp big objects for eight hours a day. (Tr. 129.) The job also required him to kneel and crouch occasionally. (Id.) The heaviest weight he lifted was 30 pounds, but he frequently lifted less than 10 pounds. (Tr. 129-30.)

On June 16, 2008, plaintiff saw Michael Spezia, M.D., for a single-visit consultative evaluation on referral from his counsel. (Tr. 248-50.) In a letter report to counsel dated June 17, 2008, Dr. Spezia opined generally that plaintiff was considered disabled for the reasons set forth in the letter. (Tr. 249.) Dr. Spezia's letter report indicated that he reviewed plaintiff's current physical condition and his past medical record, and he considered an x-ray examination of plaintiff.

In particular, Dr. Spezia found plaintiff had decreased mobility of the lower extremities because of pain, and decreased strength. Also plaintiff has difficulty with flexion of the lumbar spine, sustained walking, and sustained standing. Although his x-ray examination revealed that he had a slight straightening of the lumbar lordotic curvature, he had no fracture or dislocation. In his Medical Source Statement dated June 19, 2008, Dr. Spezia noted that plaintiff could never lift 20 pounds or more; could never stoop; and would need to take hourly breaks during a normal eight-hour workday. He also advised plaintiff to use an assistive device. (Tr. 248-53.)

On June 26, 2008, Dr. Rolf Krojanker, a psychiatrist at Hopewell, evaluated plaintiff's mental condition, at the request of plaintiff's counsel. (Tr. 254-57.) In a Mental Source Statement, Dr. Krojanker diagnosed plaintiff with paranoid schizophrenia and assigned him a GAF

score of 40.[7]  Dr. Krojanker noted that plaintiff had marked limitation in all areas of activities of daily living, social functioning, and concentration, persistence and pace; and in the past year plaintiff had three episodes of decompensation that lasted two weeks each time.  (Tr. 254-57.)  Dr. Krojanker further reported that plaintiff had substantial losses in his ability to (i) understand, remember and carry out simple instructions; (ii) make judgments that are commensurate with the functions of unskilled work, i.e. simple work-related decisions; (iii) respond appropriately to supervision, co-workers, and usual work situations; and (iv) deal with changes in a routine work setting.  (Id.)  Dr. Krojanker opined that plaintiff's limitation lasted or could be expected to last 12 continuous months at the assessed severity.  (Tr. 256.)  Dr. Krojanker stated that he had seen plaintiff twice in the past 6 months. (Tr. 257.)

In a letter dated August 13, 2008, Helen A. Minth, the executive director of the St Louis Empowerment Center, plaintiff's current employer, wrote that plaintiff has been employed there since 2003.  His duties have included cleaning and janitorial work, answering phones, and supervising the opening of the center.  She stated that he has never been physically or mentally capable of working more than 20 hours a week.  And in the past two years, he had to be relieved of some of his responsibilities "due to his deteriorating physical and mental condition."  She further stated that when he began he could do what the job required.  Ms. Minth then stated that he cannot do this kind of work, due to his "bad legs and back." He cannot "continually walk around the Empowerment Center in order to supervise the opening of the Center."  She further stated that, because plaintiff was in direct contact with other employees and center clients, "[h]is angry outbursts, paranoia, and generally bad attitude made it increasingly difficult for him to perform

---

[7]On the GAF scale, a score from 31 to 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work).  Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed., American Psychiatric Association 2000).

his job duties."  Ms. Minth also noted that plaintiff was able to work only 12 hours per week.  (Tr. 163.)

On August 25, 2008, plaintiff underwent drug testing at Global Drug Testing Services.  (Tr. 257.)  The tests were negative for all drugs tested.  (<u>Id.</u>)

**Testimony at the hearing**

At the hearing before the ALJ held on August 14, 2008, plaintiff testified that he was homeless and worked part-time at a drop-in center for homeless people.  (Tr. 20-21.)  He had to reduce his working hours due to his difficulty to do labor such as loading and unloading trucks. (Tr. 22.)  He also testified that he did not finish high school, and he was assigned to a special class for students with reading problems. (<u>Id.</u>)

Concerning his physical condition, plaintiff confirmed that he had been seeing doctors for his back pain and poor blood circulation in his legs. (Tr. 23.)  He testified that, as a result, he had difficulties with sitting for a long time and walking for long distances; so, he had to stand about every 15 minutes or stop for a break every 50 feet when walking.  (Tr. 24.)

Concerning his mental state, he testified that he was also seeing Dr. Krojanker, a psychiatrist at Hopewell Center.  (Tr. 25.)  He was prescribed Paroxetine and Risperdal by Dr. Krojanker for his depression.[8] (<u>Id.</u>)

In addition, plaintiff testified that he had been taking Lisinopril, Triamterene, Hydrochlorizide, Nabumetone and Nasacort.[9]  (<u>Id.</u>)  He further

_____

[8]Paroxetine is a selective serotonin reuptake inhibitor used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders, post-traumatic stress disorder, and a severe form of premenstrual syndrome.  Risperdal is used to treat certain mental/mood disorders.  It helps the patient think clearly and function in daily life.  <u>http://www.webmd.com/drugs</u> (last visited May 11, 2011).

[9]Lisinopril is used to treat high blood pressure.  Triamterene is used to reduce extra fluid in the body caused by conditions such as congestive heart failure, liver disease, and kidney disease, which helps the patient breathe easier.  Hydrochlorizide is used to treat high blood pressure.  Nabumetone is used to reduce pain, swelling, and joint
(continued...)

testified that the combination of all those medications made him drowsy, along with antidepressants and medicine for his blood pressure. (Id.) As a result, plaintiff testified that he often fell asleep at work for two hours during a 4-hour work shift. (Tr. 26.) He further testified that his employer was aware of his condition. (Id.)

Plaintiff testified that he had no history of alcohol abuse, but he had abused drugs approximately 11 years ago. He accepted treatment and was rehabilitated. (Tr. 26-27.)

On his financial condition, plaintiff testified that he had no other source of income other than his paycheck. Because he was homeless, he was unable to obtain food stamps. He had no medical cards and he had no present or past legal problems. (Tr. 27-28.)

## IV.  DECISION OF THE ALJ

On September 18, 2008, the ALJ issued a decision denying plaintiff's claims. (Tr. 9-16.) The ALJ found plaintiff met the earnings requirements of Title II of the Act from March 31, 2006, his alleged onset of disability, through September 18, 2008. Also, the ALJ found that plaintiff had not engaged in substantial gainful activity since March 31, 2006.

The ALJ found that plaintiff had the following impairments: obesity, minor degenerative disc disease of the lumbosacral spine, hypertension controlled by medication, a probable mental disorder with depressed mood, and personality disorder with antisocial features. (Tr. 15-16.) However, the ALJ did not find that those impairments, independently or in combination, met or equaled in severity the requirements of any impairment listed in the Commissioner's list of disabling impairments, at Appendix 1, Subpart P, Regulations No.4. (Tr. 16.)

Further, the ALJ did not find sufficient and credible evidence that any of his alleged impairments, physical or mental, prevented him from performing any sustained work activity. (Id.) The ALJ concluded that

---

[9](...continued)
stiffness from arthritis. Nasacort is used to prevent and treat seasonal and year-round allergy symptoms. http://www.webmd.com/drugs (last visited May 11, 2011).

to the extent that plaintiff's physical activities were restricted, they were restricted much more by his choice than by his impairments.

The ALJ determined that plaintiff had the residual functional capacity (RFC) to perform the physical exertional and nonexertional requirements of work, except for lifting or carrying more than 30 pounds frequently. He specifically found that plaintiff had no medically-established mental or other nonexertional limitation. (Tr. 16.)

The ALJ further concluded that plaintiff's past relevant work as a general laborer did not require performance of work activities that are precluded by the limitations the ALJ stated for plaintiff's RFC. (<u>Id.</u>)

For these reasons, the ALJ concluded that plaintiff was not disabled under the Act at any time through the date of the ALJ's decision. (<u>Id.</u>)

## V.  DISCUSSION

Plaintiff argues that the ALJ erred in his consideration of analytical Steps Four and Five by:

(1)  failing to include a narrative discussion of the rationale for the residual functional capacity finding;

(2)  failing to follow the factors of 20 C.F.R. § 404.1527(d) when rejecting the opinion of treating psychiatrist Dr. Krojanker;

(3)  rejecting the opinions of Dr. Spezia because he was retained for the purpose of litigation and without considering the appropriate factors;

(4)  failing to make explicit findings regarding the demands of plaintiff's past relevant work as required by SSR 82-62 and thereby improperly basing plaintiff's RFC upon inaccurate findings of plaintiff's past relevant work; and

(5)  failing to properly consider evidence from Helen Minth, executive director of plaintiff's employer, as required by SSR 06-03.

## A.  Steps One, Two, Three, and Five

The ALJ's decision expressed findings at Steps One, Two, Three, and Five of the sequential analysis, while being careful to indicate that progressing to Step Four did not indicate a belief that plaintiff was

disabled.[10]  Relevant to Step One, the ALJ found that plaintiff had not performed substantial gainful activity after March 31, 2006, the alleged date of onset.

Regarding Step Two, the ALJ found that plaintiff suffered from obesity, minor degenerative disc disease of the lumbosacral spine, hypertension controlled by medication, and a probable adjustment disorder with depressed mood and personality disorder with antisocial features. (Tr. 16.)

Step Two also asks whether any impairment or combination of impairments is "severe," that is, whether it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If it does not so limit the claimant, the impairment or combination of them is not severe, and the claimant is not disabled.  20 C.F.R. § 404.1521(a).  It is pretty clear that the ALJ found that plaintiff's impairments were not severe.[11]  Nevertheless, the ALJ went on to consider Step Three.

Regarding Step Three, he found that none of these impairments, individually or in combination with others, met or equaled the severity requirements of the Commissioner's list of disabling impairments.

Although the ALJ found plaintiff not disabled at Step Four, he also conducted a Step Five analysis and found plaintiff not disabled after applying Rule 201.21 of the Commissioner's grid regulations, 20 C.F.R. § 404.1501-1599.  The court, however, does not consider whether the presence of substantial evidence of a non-exertional limitation, such as pain or fatigue, required the use of a vocational expert at this step, King v. Astrue, 564 F.3d 978, 979 (8th Cir. 2009), or whether this Step analysis was otherwise appropriate.

_____

[10]The ALJ stated that, while plaintiff's doing some work at the Paraquad Empowerment Center that did not qualify as substantial gainful activity, nevertheless "does seem to show a lack of total disability." (Tr. 10.)

[11]"The claimant's allegation of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of all sustained work activity is not credible."  (Tr. 14, 16.)

**B.    RFC Assessment**

In this case, the ALJ described plaintiff's RFC thus: "The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work, except for lifting or carrying more than about 30 pounds frequently." (Tr. 16.)

RFC is the most that a claimant can do despite his limitations. See 20 C.F.R. § 404.1545(a). RFC is a medical question and the ALJ's assessment of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). While the ALJ is not restricted to medical evidence alone in determining RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). The Commissioner has the burden of determining the claimant's RFC and "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Martise v. Astrue, 641 F.3d 909, 923, (8th Cir. 2011).

The ALJ's determination of a claimant's RFC is critical to the ALJ's determination of whether plaintiff is disabled. And it is critical to this court's judicial review, because the RFC is a major standard by which the ALJ properly decides whether plaintiff can perform his past relevant work (PRW). Plaintiff has the burden of establishing whether he can perform his PRW. If he cannot perform his PRW, the burden shifts to the Commissioner to establish whether plaintiff can do any other work in the national economy. Jones v. Astrue, 619 F.3d 963, 971 (8th Cir. 2010). The ALJ determined that plaintiff could perform his prior work as a general laborer. (Tr. 16.)

**1.    Narrative requirement.** Plaintiff first argues that the ALJ's written decision describing his RFC failed to satisfy the narrative discussion requirement of Social Security Ruling 96-8p, which states:

> The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.

SSR 96-8p at *3.

The RFC assessment must include a narrative discussion
describing how the evidence supports each conclusion, citing
specific medical facts (e.g. laboratory findings) and
nonmedical evidence (e.g. daily activities, observations). In
assessing RFC, the adjudicator must discuss the individual's
ability to perform sustained work activities in an ordinary
work setting on a regular and continuing basis (i.e. 8 hours
a day, 5 days a week, or an equivalent work schedule), and
describe the maximum amount of each work-related activity the
individual can perform based on the evidence available in the
case record. The adjudicator must also explain how any
material inconsistencies or ambiguities in the evidence in the
case record were considered and resolved.

Id. at *7.

Plaintiff argues that it was not enough for the ALJ to generally restate the record evidence, upon which the RFC finding may have been based, but the ALJ was required to describe how the evidence supported each RFC conclusion.

The ALJ need not provide a narrative discussion immediately following each statement of an individual limitation in the RFC, if the court can otherwise discern the elements of the ALJ's decision-making. Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir 2003). Moreover, the ALJ is not required to make explicit findings for every aspect of the RFC. Tawfall v. Astrue, No. 4:09 CV 727 DDN, 2010 WL 3781807, at *10 (E.D. Mo. Sept. 21, 2010).

In his opinion, the ALJ discussed plaintiff's medical history, set out his conclusions regarding plaintiff's limitations, explained why he found certain items of medical evidence in the record more persuasive than others, and discussed what evidence was absent. The ALJ satisfied his responsibility to explain his decision in a narrative form.

### 2. Substantial evidence requirement

Plaintiff next argues that the ALJ's RFC determination is not supported by substantial evidence.

**a. Dr. Krojanker's report.** Plaintiff argues that the opinions of Dr. Krojanker were given but cursory consideration by the ALJ, without addressing any of the standards set out for this purpose in

20 C.F.R. § 404.1527(d)(1)-(6). These regulations require the ALJ to evaluate every medical opinion received on a claim. Unless controlling weight is given to the claimant's treating source's opinion, described in § 404.1527(d)(2), the ALJ must consider:

(1) whether the opinion is based upon an actual examination of the claimant (§ 404.1527(d)(1));

(2) whether the opinion was rendered by a medical provider who is actually engaged in treating the claimant; if so, subject to whether this opinion is "well supported" by medical data and is not inconsistent with other substantial evidence in the record, the ALJ must consider (i) the length of the treating relationship, and (ii) the nature and extent of the treatment relationship (§ 404.1527(d)(2));

(3) the extent to which the medical opinion is supported by relevant evidence, such as medical signs and laboratory findings (§ 404.1527(d)(3));

(4) the extent to which the opinion is consistent with the administrative record (§ 404.1527(d)(4));

(5) whether the opinion is rendered by a specialist in the relevant field (§ 404.1527(d)(5)); and

(6) other relevant factors brought to the ALJ's attention (§ 404.1527(d)(6)).

In his opinion, the ALJ stated the following about the opinions of Dr. Krojanker, plaintiff's treating psychiatrist:

> Dr. Rolf Krojanker, a staff psychiatrist at Hopewell, filled out a mental residual functional capacity form sent to him by [plaintiff's counsel], on which he indicated "marked" limitations in nearly all areas of mental occupational, performance, and personal-social adjustments, saying that the claimant had schizophrenia, paranoid type. However, he admitted that he had seen the claimant only twice (Exhibit 15F), presumably the two times in August 2007.

(Tr. 12-13.) And further:

> The undersigned also gives no weight to the opinion of Dr. Krojanker, who admittedly saw the claimant only twice. After the claimant appeared at Hopewell a grand total of two days in August 2007[.] Dr. Johns, who examined him only about three weeks later, was basically placing no mental limitations on him, and that was while the claimant was in an untreated state. None of the other medical records, except for Dr.

> Spezia's, make no mention of any chronic mental or mood disorder. There is no credible medical basis for his diagnosis of "bipolar disorder."

(Tr. 14.) The ALJ then went on to describe how the administrative record does not indicate that plaintiff's mental characteristics have been "significantly impaired on any documented long-term basis." The record did not indicate that plaintiff's personal mental characteristics deteriorated over any extended period of time. Plaintiff had had no course of formal mental health treatment. And, "[a]t the hearing, [plaintiff] displayed no obvious signs of depression, anxiety, memory loss, or other mental disturbance." Ultimately the ALJ determined that plaintiff has no mental impairment that "would prevent him from doing ordinary work, including his past relevant work as a general laborer." (Id.)

The ALJ considered the § 404.1527(d) factors and his findings are supported by substantial evidence. He noted that Dr. Krojanker had personally examined plaintiff, but only twice in the past six months. The ALJ's opinion indicated that he understood that Dr. Krojanker was a specialist in the area of his examination of plaintiff. The ALJ considered that Dr. Krojanker's findings indicated on the form are not consistent with the record generally (except for Dr. Spezia's report) and they are not consistent with Dr. Johns assignment of a GAF of 70[12] or with Kresheck's report that plaintiff's mental condition had only a mild limitation on his mental activities.

The ALJ noted that Dr. Krojanker assessed plaintiff as markedly limited in his activities of daily living, social functioning, and capacity for concentration, persistence, or pace (Tr. 12, 254-55), while Dr. Johns found that plaintiff was capable of completing simple tasks in a timely manner over a sustained period of time, uninterrupted by

---

[12]Plaintiff argues that the ALJ did not apply the standards of 20 C.F.R. § 404.1527(d) to the report of Dr. Johns, as he did to Dr. Krojanker's report. The argument is without merit. The ALJ's opinion demonstrated the ALJ's familiarity with Dr. John's report (Tr. 12) and he obviously compared the two reports, Dr. John's being the one containing much examination data, rather than merely conclusory findings on a form.

symptoms related to depression. (Tr. 211.) Further, although both Dr. Johns and Dr. Krojanker share the opinion that plaintiff has a mental impairment, the ALJ noted that Dr. Johns assigned plaintiff a GAF score of 70 indicating a mild or slight disorder. (Tr. 12.) The ALJ also noted that these inconsistencies were only weeks apart and plaintiff did not receive any treatment during this time. (Tr. 14.) Also, Dr. Krojanker's marks on the form represent conclusory statements that were not accompanied by underlying testing or examination data.

The ALJ also considered other medical evidence, including results from plaintiff's examinations at Hopewell Hospital and Grace Hill during the preceding years, and found no support for Dr. Krojanker's findings.

The ALJ's failure to credit the opinions of Dr. Krojanker about plaintiff's mental condition are supported by substantial evidence.

**b. Dr. Spezia's report.** Plaintiff argues that the ALJ wrongly discounted Dr. Spezia's opinion, by not applying to it the same criteria he applied to the opinions of Dr. Johns and Dr. Cason. The ALJ discounted Dr. Spezia's opinion in part because it was given to further plaintiff's litigation claims and not for treatment. (Tr. 13.) To the court's examination, the record contains no substantial evidence for discounting Dr. Spezia's opinions for the reason as stated by the ALJ: "[Dr. Spezia] was hired . . . to further [plaintiff's] litigation interests, not his treatment interests." (Id.)[13] As plaintiff's counsel argues, the Social Security Act and the relevant regulations placed upon plaintiff the burden of proving he suffers from one or more severe impairments. 42 U.S.C. § 423(d)(5)(A); 404.1512(a). Thus, the law expects that a claimant will likely engage medical consultants in an effort to meet this burden. The fact that Dr. Spezia was engaged to provide medical evidence for the plaintiff's claim is not by itself an appropriate basis for discrediting his report and opinions.

---

[13]This statement is accompanied by the ALJ's irrelevant comment, "Dr. Spezia's opinion proves little more than the obvious fact that if a claimant goes to enough doctors, he can eventually find one who will endorse his claim for disability." (Tr. 13.)

That said, the court has considered plaintiff's other argument, that the ALJ did not apply to Dr. Spezia's report and opinions the factors required by 20 C.F.R. § 404.1527(d). The court agrees.

Regarding the personal examination factor of § 404.1527(d)(1), the ALJ apparently held it against Dr. Spezia's opinions that he personally examined plaintiff at all. (Tr. 13)("He was hired to examine the claimant one time and to further his litigation interests, not his treatment interests.") <u>See also</u> footnote 12. Clearly, the gist of § 404.1527(d)(1) is that an in-person examination is a positive factor. The ALJ did not accord Dr. Spezia's report the value of being supported by a personal examination.

Because Dr. Spezia was not plaintiff's treating physician, the next relevant factor is § 404.1527(d)(3). On this factor, the ALJ stated, "He did no new x-rays, and seemed to simply take all of the claimant's allegations at face value." (Tr. 13.) Dr. Spezia's report clearly states that he considered the results of an x-ray examination of the left ankle (negative for fracture or dislocation) and of the lumbar spine (a slight straightening of the lumbar lordotic curvature and no evidence of fracture or dislocation). Dr. Spezia also obtained much information about plaintiff's medical history. He also physically examined plaintiff and observed limited ranges of motion and mobility in his legs, along with pain in his left ankle. (Tr. 249.) The ALJ's consideration of this factor is not indicated by the opinion.

Regarding the consistency factor of § 404.1527(d)(4), the ALJ states that Dr. Spezia's findings, made on June 17, 2008, are inconsistent with "all of the previous medical records." (Tr. 13.) The record shows that Dr. Spezia's findings on plaintiff's range of motion limitations, his leg pain, and his difficulties with flexion of his back (Tr. 249) are consistent with similar findings by consulting physician Elbert Cason on August 27, 2007, and Dr. Cason's attributing much of plaintiff's condition to his greatly overweight condition. (Tr. 199-202.) The ALJ's consideration of this factor is not supported by substantial evidence.

The ALJ's opinion, aside from the comments quoted above, did not consider, pursuant to § 404.1527(d)(5), that the record does not indicate

that Dr. Spezia was a general practitioner and not a specialist. (Tr. 248.)

Because the ALJ discredited Dr. Spezia's opinions for a reason that is irrelevant (the consultative examination was obtained to further plaintiff's case for disability) and for a reason that is not supported by substantial evidence (the findings were inconsistent with all previous medical records), and because he did not apply the factors called for by 20 C.F.R. § 404.1527(d), plaintiff's claim must be remanded for appropriate consideration of Dr. Spezia's report.

### 3.  Failure to make specific findings regarding PRW and RFC

Plaintiff argues that the ALJ failed to make explicit findings regarding the physical and mental demands of plaintiff's past relevant work and to compare them with the corresponding conditions of plaintiff's RFC.  The court agrees.

An ALJ is required to make explicit findings of the actual physical and mental demands of the claimant's past relevant work and then must compare them with the claimant's RFC.  <u>Ingram v. Chater</u>, 107 F.3d 598, 604 (8th Cir. 1997).  For cases involving mental or emotional impairment, an ALJ must obtain a "precise description of particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of task, independent judgment, working with other people, etc." SSR 82-62, 1982 WL 31386, at *3.  In this connection, the ALJ has the responsibility to obtain information concerning the work the claimant has done during the relevant period of time.  <u>See</u> 20 C.F.R. § 404.1560(b)(2).  Sources of this information include, without limitation, vocational experts or specialists, the Dictionary of Occupational Titles (DOT) and its companion volumes and supplements, published by the Department of Labor, as well as the claimant's own description of his past work.  (<u>Id.</u>)

The ALJ did not make sufficient and specific findings of what physical and mental abilities were necessary to perform plaintiff's former employment as a general laborer, as required by 20 C.F.R. § 404.1520(f).  Instead, he adopted incomplete information provided by plaintiff to SSA and recorded in an interview report.  (Tr. 147-48.)

The record indicates that plaintiff worked as a general laborer for several employers. The ALJ did not investigate whether the general labor work requirements differed among these employers.[14] The failure to make specific findings of the physical and mental demands of plaintiff's prior work as a general laborer deprives the court of an adequate record to determine whether these demands could be met with plaintiff's RFC.

Further, plaintiff last worked as a general laborer in 2003, three years before plaintiff's alleged onset of disability and five years before the ALJ's findings of what plaintiff's RFC were when the ALJ rendered his opinion. In this respect, the unequivocal and repeated evidence that plaintiff's obesity diminished the ranges of motion in his legs leaves the record without substantial evidence to support the ALJ's general RFC finding that plaintiff is generally able to work, limited only to lifting or carrying more than 30 pounds frequently. In this respect, this case is like Frankl v. Shalala, 47 F.3d 935 (8th Cir. 1995). In that case, the ALJ relied upon medical records from August and September 1990 and did not consider the evidence of the plaintiff's deterioration thereafter. 47 F.3d at 937-38.

Here, the ALJ's very general RFC finding that plaintiff is able "to perform the physical exertional and nonexertional requirements of work, except for lifting or carrying more than about 30 pounds frequently" (Tr. 16) is not supported by substantial evidence. First, the ALJ seems to have relied upon the report of the agency disability examiner.[15] (Tr.

_____

[14]This is indicated by the ALJ's speculation about whether plaintiff's PRW is skilled or unskilled. (Tr. 15) ("His past job was probably unskilled.")

[15]The ALJ commented that, "[e]ven if one were to find that [plaintiff] has an exertional capacity for no more than sedentary work, less than that cited in Exhibit 3A [(Disability Examiner Hughes's report)], such that [plaintiff could not do [the general laborer] work . . ., he would still not be disabled," relying on Grid Rules 201.21 and 201.27. (Tr. 15.) This reference to Exhibit 3A, the Disability Examiner's report, indicates the ALJ relied upon it as evidence of plaintiff's RFC.

15.)  That report is not substantial evidence of plaintiff's RFC.[16]  The
Disability Examiner is not a medical source.  He conducted no personal
examination of plaintiff.  He merely reviewed the record, which,
regarding plaintiff's past relevant work, contained only another person's
recording of how plaintiff described this work that had occurred several
years previously.  And the record the DE reviewed did not contain medical
evidence.

Therefore, on remand, the defendant Commissioner shall further
investigate the specific nature of the general laborer work plaintiff
performed, giving consideration to the perhaps differing demands by the
several employers.  Relevant information may come from sources other than
plaintiff's recollection.  See 20 C.F.R. § 404.1560(b).  The ALJ shall
apply these specific findings to a reconsidered RFC, to determine whether
plaintiff can perform his prior relevant work.

### 4.  The evidence from Helen Minth

Plaintiff argues that the ALJ failed to properly evaluate the
information provided by Helen Minth, a non-medical source.  The court
agrees.  She provided information about plaintiff as his current employer
regarding his performance of his employment duties.  The ALJ may consider
this "other source" evidence and its relevance to the severity of
plaintiff's impairments.  20 C.F.R. § 404.1513(d).  When "other source"
information is considered, the ALJ should apply the factors set forth in
20 C.F.R. 404.1527.  See SSR 06-03P, 2006 WL 2329939 at *5 (2006).  When
considering "other source" information, an ALJ has more discretion than
when medical source information is considered and may consider any
inconsistencies found in the record.  Tindell v. Barnhart, 444 F.3d 1002,
1005 (8th Cir. 2006).

Ms. Minth employed plaintiff as a client monitor at the Paraquad
Empowerment Center, a social service agency.  Plaintiff described this
work to a case worker who recorded it on a work history report form for
the SSA disability examiner.  (Tr. 145-46.)  Plaintiff began working

---

[16]Such a report, even if based on record evidence, is itself not
evidence.  See 20 C.F.R. § 404. 1527(f).

there in 2003 and was working there as of the date of the ALJ's decision. However, due to the few numbers of hours he worked, the ALJ did not consider that work to be substantial gainful activity. (Tr. 10.) The report indicated that plaintiff made sure that agency clients signed in when they arrived. He sat at a desk and monitored what the clients did. He changed tv stations for them. Plaintiff described this position as "no hard work." (Tr. 146.)

Ms. Minth's report was dated August 13, 2008 and described plaintiff's work as a part-time employee of the St. Louis Empowerment Center since 2003.

The ALJ considered plaintiff's ability to work there as much as he did indicated that he was not disabled. (Tr. 10-11.) He reached that conclusion after considering Ms. Minth's letter that described how plaintiff was unable to perform the duties of that position. About this information, the ALJ commented:

> If the claimant were as bad off as Ms. Minth indicates, physically and mentally, it is unlikely that she would allow him to continue working there at all.

(Tr. 10.) This statement indicates that the ALJ discredited Ms. Minth's information, based upon the ALJ's speculation about what she truly observed, about the purposes of his being employed there, and about the value of his work there. Such speculation is not substantial evidence. Upon remand, the ALJ will reconsider the report of Ms. Minth according to the standards in 20 C.F.R. § 404.1527.

## VI.  CONCLUSION

For the reasons set forth above, the court concludes that the decision of the ALJ is not supported by substantial evidence. The decision of the Commissioner of Social Security is reversed and remanded for further proceedings consistent with this memorandum opinion. An appropriate Judgment Order is issued herewith.

        /S/   David D. Noce
        **UNITED STATES MAGISTRATE JUDGE**

Signed on September 26, 2011.